I think the best way to do this actually is, I have a couple of questions that relate to the public jurisdiction here, which nobody briefed, and rather than sort of eat up your time on this, I think maybe if it's all right with you, I'd like to address that with, we First, and so we'll have the State, and then we'll hear from the plaintiffs, and then after a brief discussion, then we'll go back to the preemption issues that are really the focus of the briefs, and then we'll use the clock for this. I don't think that this is going to take too long, but make sense to you? Sure, of course, Your Honor. So Ms. Vail? Yes. Let me just sort of tee this out. I mean, it seems to me there's kind of two problems here. One is, it's not even clear to me that this judgment is a final judgment, because plaintiffs, they had an extra claim that they have dismissed without prejudice, voluntarily. And I think the case law around here is pretty clear that a dismissal without prejudice, a voluntary dismissal without prejudice, ain't a final judgment. As a caveat, I think that there's a slight exception to that, but I don't think it applies to yours. Is this something that you've thought about? It's not something I've thought about too much, although I did think about this issue for a different case quite a long time ago, so I will try to recall that. If I recall correctly, I thought that the Second Circuit was slightly differently situated in terms of precedent on this than some of the other circuits, and that the Second Circuit had a precedent saying that there could be a final judgment in these circumstances. And I don't remember the name of the case offhand, but I do remember the Second Circuit having a precedent that was different in saying that when there was a dismissal that brought in a final judgment, like here, where the district court then entered a judgment that that could be final for purposes of appellate jurisdiction. Well, there's a case, Perdy v. Zeldins, which allows for a voluntary dismissal to not kill a penalty requirement where that open claim is conditioned on the right to reinstate that open claim is conditioned on the outcome of the appeal. But that doesn't seem to be the case here. Yes, that's right, Your Honor. I mean, I guess maybe I understood that that is how the parties envisioned what was happening here. My understanding is that the outcome of this appeal would matter for whether or not the claim could be reinstated. My understanding would be that if the court was to reverse the final judgment and the case was to go back, I mean, in our view, the case would likely be over, but it would only be... Would they be able to bring a 1983 claim if the case goes back? I mean, I think... I mean, I think they might... And they won't be able to if they win? So if we affirm them here, they don't get to assert this 1983 claim and seek what I assume is basically attorney's fees? Well, I guess my... Maybe a better question. Yeah, I mean, I think my understanding, and maybe I'm misunderstanding, but I think my understanding of the way the parties brought this... Tried to bring the legal issue up to this court was that if there was an affirmance, then they'd be done. They have their final judgment that's been affirmed, and I don't think they would be bringing the other claim again. If there was a reversal of the judgment and we went back, then I guess there would be whatever further proceedings might happen in the district court. I think we would think if there was a reversal and the legal issues were decided in our favor, then the case would essentially be over anyway, and the parties would either end the case or we would make a motion to end the case based on this court's decision. But nothing precludes them from reinstating the claim... Seeking to reinstate the claim that's been at this point dismissed without prejudice. I would have to go back and look at the stipulated final judgment, but if it says that it was dismissed without prejudice, then I think if there was a reversal and it went back, they could theoretically try to reinsert a claim, but I think the legal... I'm not sure how much room they would have to maneuver on the legal issues at that point because if this court decided the legal issues against them, I don't know that they would have much more that they could do. It's not a case, for example, as I understand it, it's not a case where they brought a claim like a dormant commerce clause claim. There was no such claim in this case, so it's not that we would be going back for a whole different claim with a whole different analysis. The district court didn't address this at all, so that would be a new claim that would be started up depending on what happens in this case or not. It's not clear. But the other, I guess, question I have is a more basic one. It seems to me that the state firmly agrees to be permanently enjoined for enforcing the ABA, and that seems like a relinquishment or abandonment of the claim to enforce the ABA for the injunction, and so I'm not sure why... It's sort of an end run here. Normally what would happen is you have a preliminary injunction, the court grants it, you then have the right to appeal that preliminary injunction. That's initially what happened here, but then you decided to make this a permanent injunction, and you didn't move in the district court for summary judgment, or they didn't move for summary judgment to say let's get a final judgment that includes a permanent injunction for all the reasons that are in the preliminary injunction order. Instead, you guys walked in with a settlement effectively and said sign, and you carved out some room for appellate review, but you don't generally get to do that in a settlement, and so I'm not sure why you get to do it this way. Well, I would push back on the idea that it was a settlement or that we waived any rights. I mean, it's very clear that we preserved our appellate rights to raise all of the... All right, so you and I have a contract dispute, and we settled it so that you're going to give me back my capital, but we reserve all our appellate rights. Do you think you get to do that, and then you get to go to the court of appeals? I mean, why do you need to go to the district court at all then? Well, I think in this case, I mean, what happened here was that based on the legal rulings that the court made in the preliminary injunction ruling, I think it was clear to everyone that the legal question was going to be dispositive of this case, and so the parties agreed. We did agree to do a final judgment, but with the right to appeal, just as we would have been able to appeal the preliminary injunction, and I have seen this done in other cases. I have seen this done in other cases, and I will say, I mean, I've seen other cases where, you know, I don't know... There wasn't a summary judgment. There wasn't a conversion to a summary judgment. There was not. Heck, no. We didn't go through the process of filing another motion, but we did have the court. It's not, you know, the court did sign a final judgment saying that, you know, it was adopting the reasoning of the preliminary injunction, and that's the judgment that's now on appeal. So it's not that we just entered a settlement, and the court so ordered it, and there wasn't the court making any sort of ruling. I mean, the court, I think, did adopt its reasoning from the preliminary injunction in signing the final judgment, and we preserved the right to appeal those legal issues. And in terms of the other claim, the 1983 claim coming back, I don't... I do think if the court were to reverse and it was to go back, I don't see how they could actually reassert the claim. I know that they technically preserved it without prejudice, and so we might have to litigate it from the district court, but I do think that, as I understand it, the 1983 claim is based on the same legal theories as the other claims. So if the court... I don't know that that solves the problem for finality. So what you're saying is that once we, if we were to affirm, then we will have an actual piecemeal litigation. So the claim that was brought initially in their complaint will now be litigated again. Something like that. I guess that's not my understanding. My understanding was that if there was an affirmance, the case would also be over and it would be done. So why without prejudice? I think maybe that was a belt and suspenders move. I don't know if maybe they would be willing to say that they are willing to dismiss it with prejudice. I mean, do you want to just go straight to the Supreme Court? You can bypass us altogether, too. I mean, there are procedures here, so it just seems to me that, you know, there might be ways to do this. But, I mean, we have rules that allow for interlocutory appeals even. But if you don't want to take advantage of them, you don't generally get to just sort of agree among yourselves that this is the way we're going to do it and just ask the district judge to sign. I may want additional briefing on this. Okay. Yes, we'd be happy to do additional briefing on this. I do think having the district court agree to it is not just a rubber stamp, but the from the preliminary injunction and doing it as a final judgment. Well, but it wasn't a separate motion, right? You guys walked in with a stipulated agreement of a final judgment. But no one was required to bring a summary judgment motion, either. He could have just proceeded to trial. Correct. And there could be stipulations that the district court then adopts as part of his final judgment following trial. I suppose the question is, is there some formality that required that to happen differently than the stipulation usually? I don't think so. I mean, it's true that we did not do, we didn't do it in the form of a motion with a notice of motion. But I think what was done here is essentially the same. And because the judge didn't just rubber stamp something. The judge agreed to adopt its reasoning from the preliminary injunction into the final judgment. And there was, I don't think there was... So it's the final judgment pursuant to what? Pursuant to the court's order. Pursuant to what rule? Pursuant to the court deciding to issue a final... No, no, no. Judges can't issue a final order on a motion for a preliminary injunction. Can't do that. If you make a motion for a preliminary injunction to me, I can't say, not only do you win on your motion for a preliminary injunction, I've decided that you win the case. That, if the district court did that, there would be problems, right? Well, I think if the parties were willing to agree that there aren't any... Agree? Wait, that there aren't any factual issues that they want to go to trial, and that there's just a legal issue that they think the court has already decided, then the court, then they can agree that you've essentially already decided this legal issue. You've got to find some authority for that. Because it seems to me what you normally need is a judgment. And a judgment is not just something that you get to walk in with, unless that's basically a settlement. So, you said you've seen this before. I'd be curious to see it. But let's hear from the plaintiff on this, because maybe... Sure. I may be missing something, but if you'd give me pause. Thank you, Your Honor. Mr. Engstreich? Yes. Am I pronouncing that right? Yes. Close enough. It seems like not. How would you say it? I would say the C is an S, so Engstreich. Engstreich. Okay. Well, that's... Okay. So, Mr. Engstreich, let's start with the... Can I start by clearing one thing up? We did file a motion. It's docket number 30. We did move for judgment based on the agreement to enter this. Right. So, we didn't... Judgment based on an agreement is what? That's usually called a settlement. So, Your Honor, I've not dealt with it in the situation of preliminary injunction motion, but I've certainly had cases where we had a disagreement on liability, and once that was resolved, the parties were able to agree what the damages would be as a result of the liability ruling, and then rather than engaging in unnecessary motion practice or a trial where there were no disputed facts to find, the parties agreed on what the damages would be based on the liability ruling and then appealed... You know, entered into an agreement that was converted into a judgment, which was then appealed as to the liability ruling... But not as to the damages. But not as to the damages. No, that's right. It's more distinguishable than the facts here, right? I think what's not been appealed are the other elements of the preliminary injunction motion that would have been at issue in, you know, had the initial appeal gone forward. I think what you're basically saying is no harm, no foul. This is sort of pretty much the same as if we had made a motion for a summary judgment and we had gotten a ruling from the court on that. But it seems to me to be procedurally different. But what about the claim you kept in your back pocket, which is the 1983 claim? It's not in our back pocket. If we prevail here, we do not intend to bring it. If we lose here, as this bail said, there is no basis for prevailing on that claim if we can't prevail on the primary claim. So you're basically saying then that you were dismissing it with prejudice? So our real concern is what does that actually mean? Normally if you dismiss a claim with prejudice, it has, given the overlapping issues between the 1983 claim and the primary claim, there was concern on our part that a dismissal with prejudice would be adverse to us given, again, the overlapping issues. Yeah, that's why you could have built it into your settlement on all the other claims and said that you not only win on the preemption claims, but you also win on your 1983 claim. And we did suggest that, and I don't recall at this point why the state was establishing that. It seems to me that we have finality rules for a reason. Can you answer if that's necessary for a final judgment, would you, assuming agreement, be willing to dismiss with prejudice at this point as part of your overall stipulation? On the understanding that doing so won't prejudice the issues that are before the court on appeal, yes. You're concerned that the dismissal of prejudice in the 1983 claim somehow has preclusive effect? That was our concern with dismissing with prejudice, was that because it's based, as Ms. Bell said, on the same set of operative facts and the same theories, the reason we think New York was acting in violation of federal law. That's why you've got to litigate in district court first. And if you've got a claim that you want to bring, then you've got to bring it to ground in the district court. You don't have to say, you know what, we'd rather just be in the court of appeals, or maybe we'd rather just be in the Supreme Court. You don't get to do that. And so you can't say, well, we don't want to litigate this 1983 claim now. Because it might be complicated. So we'll keep it out of back pocket, do it later, but we have a final judgment. Again, Your Honor, just to be clear, we do not intend to litigate it later. We both recognize that the— Well, you brought the claim. So either it's dismissed with prejudice or it's dismissed without prejudice. If it's without prejudice, you get to litigate it later. If it's with prejudice, you don't. You can't tell me that you don't want to, but you don't want it to be with prejudice. So, Your Honor, on the understanding that a dismissal with prejudice does not implicate the merits of the— Well, you must have thought there was something to this claim. So why don't you then just litigate it in the district court? There was a preliminary injunction. So what would have been the downside to doing that? I think it was the cost to the parties and the judicial economy of litigating a claim where both sides agreed that the district court's legal rulings resolved the issues. And to the extent 1983 gave us attorney's fees, my clients were not looking to impose those costs on the state. And again, to go to Judge Nathan's question, if the simplest way to cut through the knot here is for us to dismiss it with prejudice, and I'm not hearing anybody, including Ms. Vail, suggest that doing so would in fact prejudice the issues in front of the court, I'm happy to represent that we do that. Okay. Anything else you want to say on this issue? No, these issues— Unless you have questions that I haven't answered. No. So I guess let's get now to the main event, which is the merits with respect to preemption. I'll just say I think we would agree to what my colleague just said, that if we wouldn't—if he's willing to dismiss with prejudice, with the understanding that it doesn't prejudice the issues before the court, that would be fine. So with prejudice but without prejudice is what you're saying? No, I don't understand that to be what he's saying. I mean, I think if he's willing to dismiss with prejudice, I'm willing to agree to that. Well, I'm sure you would be willing to agree to dismiss with prejudice, but it's not going to affect you in a negative way. It might affect him in a negative way, which is why these things generally get run to ground. People bring all their claims at once. They're litigated in the district court. The district court issues a final judgment, and then we resolve all the issues. If you think that there are some issues that are just not worth pursuing, then you have to make that call and you drop them. But you don't get to say, we dropped them unless we might need them later. That's not a final judgment. So, okay. All right. So we've given you 10 minutes for this argument. It could go longer, I anticipate, but you reserve two minutes for rebuttal. Yes, Your Honor. So let's hear you on the issue of preemption. Thank you. Thank you, Your Honor. May it please the Court, Judge Bell for the New York Attorney General. New York's Affordable Broadband Act protects low-income consumers in New York by ensuring that they are offered a basic broadband service at an affordable price, helping them to- Does the rate regulate? It does regulate the price of broadband for a certain class of vulnerable consumers. So if by rate regulation you mean it does touch on the price of broadband for some consumers, yes. Is it a full common carrier regulation? No. We would disagree with that. And this kind of price- Is it a full common carrier regulation? Yes. Scientists try to characterize the Affordable Broadband Act as a common carrier regulation, and we disagree with that. Common carrier regulations usually regulate the price of a product for all consumers who want it. There's usually a whole suite of other protections that come with common carrier regulations, like nondiscrimination for all consumers. This is a targeted consumer protection regulation to a particularly vulnerable class of consumers. So if you had a comparable, in all ways comparable regulation or price- What did you prefer to call it? A price regulation rather than a rate regulation? If we had a full common- Well, I'll put it this way. So if you had everything comparable but for long-distance telephone calls, is that a common carrier regulation? I don't know that that would be characterized as a common carrier regulation. However, because you're talking about telephone calls, I would say that the state can't necessarily just do that, because you'd be talking about a Title II common carrier service of telephone, which is under quite a different regulatory regime where the FCC has different authority. And this consumer protection regulation is squarely within the state's police powers. The district court has a sweeping field preemption ruling that would stop the state from doing any consumer protection for any interstate- They've walked away from the definition of the field as broad as the district court accepted. Correct. They have abandoned that argument, and now they're looking at any price regulation of any interstate communication service. But that argument fails for the same reason. It's contrary to the basic structure and many provisions of the Act, this court's precedent, and the history of states regulating the price of services that are subject to the FCC's limited ancillary authority. Turning to the structure and provisions of the Act, field preemption requires a clear and manifest intent by Congress to regulate so comprehensively that there's no room for states. We do not have that here, because the Communications Act does not comprehensively regulate all interstate communication services. Interstate communication services is an umbrella term that covers all the different subcategories, information services and telecommunication services and cable and radio. And when it comes- You have to look at, when it comes to the scope of congressional regulatory work here and the FCC's authority, you have to look at which service you're talking about, because the FCC's authority is quite different depending on which service you're talking about. For information services, which is what broadband is, the FCC's authority is limited to ancillary authority, and that is quite limited and different from the authority it has under other titles. For ancillary authority, the FCC needs to, if it wants to regulate an information service, it needs to be able to link to a different statutory authority that it has in one of the other titles. So it has to be doing something that's serving its authority for telephone under Title II, or cable under Title VI. When it comes to broadband, the FCC does not have ancillary authority to regulate the price of broadband. I think the plaintiffs agree with that. The FCC's 2018 order makes that clear, and the D.C. Circuit's Comcast decision makes that clear as well. And that kind of limited authority, both for ancillary authority in general and for broadband in particular, is the opposite of what you would need for field preemption. Field preemption requires Congress coming in and sweeping away the states, and you don't have that. You have plenty of room for states to regulate. There are also many specific provisions of the Act that are contrary to field preemption. These are discussed in our opening brief at 29 to 31 and the reply at 12 to 15. I'm not going to try to march through all the provisions here. I will highlight just a couple that do double work, because they both recognize the state's traditional consumer protection authority and have a limited specific express preemption. The problem with your field preemption argument is that you obscure the difference between interstate and intrastate communications. You seem to think that it turns on where the provider happens to be at headquarters or its contracting unit and where the consumer happens to have their laptop. And that doesn't make something intrastate. Intrastate is about the communications, and the communications seems to me to be no skew, that the communications here are going all over the place. They are by definition intrastate. Your Honor, to be clear, we are not arguing that this is intrastate in the sense that it would fall under 152B and the FCC would be entirely precluded. We agree that the broadband service in general is interstate in the sense that it falls under 152A, but that doesn't mean field preemption. 152A is the general jurisdiction for the FCC over interstate, and this Court was very clear, already ruled in global math, that 152A, general jurisdiction over an interstate service, does not mean that the FCC has exclusive jurisdiction. You're not ending your field preemption argument on a characterization of this as solely intrastate regulation. Correct. We are not. That is not our argument. We did point out that this is a more traditional consumer protection provision that doesn't have a widespread extraterritorial effect. This is the price of a product in one state. It's very easy for broadband providers to charge different prices in different states. They already do that for whatever reason. But our argument does not hinge on it being intrastate, and that's because the states do have authority to regulate interstate services that fall under only the limited ancillary authority, and we see that not just from this Court's cases and the Supreme Court's case in head, but also the history of cable. So cable, before there was a Title VI, cable was subject only to the FCC's ancillary authority. And at that time, states pervasively regulated cable, including by doing rate regulation. And that's the TVPICS case where the Court affirmed in Nevada that was a full-on, what I call full-on common carrier regulation. We think New York's statute is much narrower than that. But even something as broad as requiring just a reasonable rate for cable service was affirmed against field and conflict preemption because at that time the FCC had very limited authority over cable, and so there was plenty of room for states to regulate it. And there has been a history of states regulating broadband once it was classified into an information service. So this is not the first time states have ever regulated broadband. There's, of course, the California net neutrality law, and other states have those laws as well, upheld by the Ninth Circuit. Can you talk about the second system? So IVY seems to me a case that you have to do pirouettes to get around. So explain to me why that doesn't resolve this case in favor of the plaintiffs. Sure, Your Honor. I think there's really three main answers. First of all, IVY was about complete preemption, and that was abrogated. Wasn't it about both field preemption and complete preemption, and the abrogation in the Marcus case was about complete preemption? Well, to the extent there was anything about field preemption, it was talking about common carrier regulation. Title II. Exactly. I don't think there was a Title II then, but it was a common carrier regulation. And you can look at IVY. It says what it's talking about when it talks about field preemption is the comprehensive legislation regulating common carriers engaged in interstate telegraph and telephone transmission. And that makes all the difference, because when it comes to common carriers, its whole reasoning is about the nature of the regulations, which is what's absent in Title I. Exactly. And in IVY, when it starts to explain what it means by comprehensive legislation, it's going through the common carrier provisions. It's going through just and reasonable rates and antidiscrimination. That's all what's now in Title II. And that difference matters, because when it comes to Title II, we agree that the FCC has much more authority. That's clear from the statute. And I think the global NAPS decision from this court makes clear that IVY is not controlling, because global NAPS said something can be interstate and still be subject to the state's regulation when that hasn't been preempted. I think if there was sweeping field preemption from IVY, global NAPS couldn't have come out the way that it did. I'm happy to turn to conflict. There's no conflict here with the 2018 order, because the FCC has no authority under Title I to regulate broadband prices, and without that regulatory authority, it can't preempt the state from doing so. That's a basic principle of federalism and administrative law. A federal agency can only act if it has statutory authority from Congress, and without that authority, it cannot preempt. The classification decision itself does not give the FCC widespread roving preemption authority. The classification decision is a fork in the road. Congress has set up two different statutory paths and has set by statute the regulatory tools that the FCC has on each path. On the ancillary authority path, the Title I path, the FCC has very limited authority, and that is the path that the FCC chose here. When it comes to Title II, there's a different path. Congress has made a different choice for Title II and said there the FCC has both a lot of authority over Title II services and Congress has given the FCC the specific deregulatory authority that it's trying to claim here. That's Title II forbearance. So your argument basically is that if it's in Title II, then they get to regulate, but the feds get to regulate exclusively with respect to rates. But they pulled out of that because they were worried that even the threat of that was going to undermine investment in broadband. So they go to Title I and you say, ah, well, that opens the door then to not only— that allows every state in America to do the kind of regulation that the threat of regulation under Title II was having a negative impact on investment. So that's your argument, right? Yes, Your Honor, and there's a couple reasons why that makes perfect sense. One is that's the system that Congress set up in the statute by giving the FCC a lot of authority and specific deregulatory authority in Title II, but not in Title I. The goal is to let the FCC basically decide what's the best way to promote broadband so that ultimately it's cheaper for consumers. But you're saying that because of the way Congress set this up, they don't really get to do that. They get to go all or nothing. They have to go either a half measure in Title II, which the threat of federal regulation is going to undermine investment, or they have to go to Title I, which means that every state in the union gets to regulate, which I assume that will have a much greater chilling effect on investment. So that's what you think is what Congress had in mind? Yes, I mean, I think if you look at—well, a couple things, I'll say, Your Honor. I mean, I agree that it was the FCC's policy view that it gets to just choose whether to do— to deregulate for all sovereigns, both the feds and the states. It said as much in its express preemption ruling in the 2018 order, and Mozilla said, no, no, no, just because the FCC wants that doesn't mean that they have statutory authority to do it. Do you think that's what Mozilla says? As to express preemption, yes. Your Honor, it's a conflict. I agree that Mozilla did not specifically rule on conflict preemption. In fact, it rejected that argument. The dissent pretty much floated. I do not agree that it rejected the argument on substance. I agree that Mozilla—the court said, there's no specific state statute in front of us, so we are not going to decide conflict preemption. It left it open for another day, but it did not rule that there were any specific statutes that would be conflicted. What it said was that it wasn't going to rule on whether there might be some things that the FCC did. What might? Can you conceive of what, under the Mozilla reasoning, of what it left open, of what would be printed? One example is the transparency rule. So the transparency rule, which the FCC had authority to do by connecting to the reporting provision, that was within its regulatory authority. So that could have preemptive effects down the line if states do statutes that conflict with that. And Mozilla said it wasn't going to try to imagine what else might be out there, but the reasoning of Mozilla as to this type of law applies and is correct, because Mozilla was focused on, look, you have to look at whether the FCC has authority to regulate to do the specific thing at issue. Could the FCC have accomplished the same thing by classifying under Title II and forbearing, or no? Maybe. I think certainly the FCC has a lot of authority under Title II and can do forbearance under Title II. And in the 2015 order, it did forbear from a lot of provisions, including rate regulation. And I also do want to get back to the idea of the policy or the point of all of this. If you look at Congress's policy, there is no congressional policy in the Act to say, if you put it in Title I, complete deregulation. Nobody gets to regulate. That's not in Title I.  It limits the FCC's authority, but a limit on the federal government's authority doesn't limit the states. And, of course, the states don't need a grant of authority from Congress to regulate. The states have their sovereign powers, and they keep on going unless there is a preemption. And we don't have preemption here. So there is no congressional policy to stop the states from regulating for an information service. And I think we see that. This does go back, I think, to a lot of the field preemption arguments, because you look at the statute, its structure, and its provisions to see what was Congress's policy, and there is no policy when it comes to information services of kicking states out. And you see that in the history of cable that we talked about, and you see that in all the various different provisions of the Act that recognize the states' role, including sometimes for rates. And there are plenty of provisions in the Act that do and express preemption for rates when that's what Congress wanted. And so Congress's actual policy was to make very deliberate choices throughout the Act about when it wanted the SEC to have exclusive jurisdiction, when it wanted there to be preemption, and when it didn't. And when it comes to information services, there's no preemption. That is not in the Act. All right. Why don't we pause, and then we'll stop here. Thank you, Your Honor. We've got two minutes for rebuttal. We'll hear from Mr. Einstein Chanel. Okay. You may proceed. Thank you, Your Honor. May it please the Court. The D.C. Circuit has held that the FCC has statutory authority to regulate broadband, including and up to rate regulation. The 2018 order is the FCC's decision not to exercise the full measure of that authority to conclude that broadband shouldn't be subject to rate regulation, as Your Honor said, that it would best flourish without that. That kind of decision is exactly what New York's law inflicts with. New York wants to impose rate regulation on the very same service defined in the very same way. That's a square conflict. And it also regulates in what Global Maps recognized. Citing IV Broadcasting, is rate regulation of interstate communications, which was the thing that this Court called out that Vermont had stopped short of in the Global Maps decision, suggesting that had it gone further, it would have squarely entered a field that it could not operate in. And four FCC commissioners, including one who dissented from the 2018 order, agree that Judge Hurley, in finding this law preempted, applied bedrock principles of communications law. And that... Or a conflict preemption. Or a field preemption. I think both in that brief. I think the FCC commissioner's brief is very clear that when you're dealing with an interstate communications service, the services that the Supreme Court held at 152A, grants the FCC authority over all of them, not merely the ones that are also referenced in Titles II and III and VI, that that kind of service should not be rate regulated by the states. So we have a conflict because the FCC could have gone further, but chose not to. And that choice doesn't deprive it, right? The 2018 order will not prevent a future FCC that thinks differently about how best to regulate broadband and promote its use from exercising more statutory authority. Could the future FCC make the same classification decision, but justify it on a policy of pro-state regulation, sort of anti-preemption policy? I don't think the FCC can conclude... I don't think the Communications Act reflects congressional indifference to what happens to Title I interstate services. What the Communications Act is best understood as is like the Natural Gas Act, right? When Congress decided in the Natural Gas Power Act that certain interstate sales of gas should not be rate regulated in the traditional common carrier sense. And instead should be left to the free market. But you're saying that it has the authority to exercise a policy determination against state regulation by classifying it as Title I regulation. Right? I think it has the authority, what the DCS recognizes, it has the authority to decide where within the tools in its tool chest, I mean, it's Chevron Step 2 definitional interpretation. But you want Chevron deference, it's like Chevron Square. You want Chevron deference to Chevron deference. I don't think so, no. I think what Chevron here says is, much like in the Puget Sound case, Ray, the Atlantic Richfield, right? The Secretary of Transportation had the authority to ban certain size tankers from entering the Sound, concluded it should not exercise the full measure of that authority. That's Title II and forbearance, isn't it? It's not, Your Honor, because I think that misunderstands forbearance. What the forbearance provision says is that where the FCC decides to forbear from applying a provision of the Communications Act, a state commission may not continue to apply or enforce the act. New York doesn't claim to be enforcing the Communications Act through its statute here. New York, right? So if the FCC forbears and the state claims, there's a step back, right? In the Global Max case, right? It took away power over local telephone service and parceled some of it back to the states. It said to the states, you can do things, and this was what this court was reviewing in Global Max. Now the FCC decided that Section 252 should no longer apply. What 160 says is the state can't come along, right? Vermont can't say at that point, yeah, but Congress said I can do it, therefore I can still do it. I don't have to listen to you, FCC. All 160E says is that you can't continue, states, to do the things that Congress explicitly said you can do. If the FCC says they shouldn't be done anymore, now if a state decided to pass a state law that tried to do the same things under state law, I think there'd be a conflict preemption argument because the state's decision to engage under state law in a kind of regulation that the FCC has held should not happen as a matter of federal law as to the very interstate services that the FCC is charged with regulating, you'd have a square conflict. We have the same square conflict here because the FCC could have engaged in rate regulation. It decided it should not engage in rate regulation and New York is not trying, we heard Ms. Vail say this conclusively contrary to the arguments below, they're not claiming this is a 152B protected service and I think it's telling, going back to Judge Sullivan, your question about Mozilla, right? Judge Williams in dissent did not say, well, maybe states are gonna do something about transparency and oh my, that would be bad. He said, he read the majority to have freed each of the 50 states to impose the heavy hand of Title II on the internet and if the Mozilla majority thought as New York did that that was the necessary consequence of the FCC's choice of Title I, it would have said, you're right, Judge Williams, that's the necessary consequence of the FCC's choice. I'm not sure it could have upheld the FCC's decision that insulating broadband from this kind of regulation would best promote it as not arbitrary and capricious if doing so had opened the door, as Judge Hurley noted in footnote nine of his opinion, but they didn't say that. They said his argument was a straw man. New York's argument is his argument. New York's argument is a straw man. What the FCC did in the 2018 order was try ex ante to sweepingly preempt any law about broadband, whether it conflicted with federal law or not, whether it was applied to a law unlike New York's that addressed only intrastate services. And what the D.C. Circuit said was if you want to preempt non-conflicting laws before they're even passed, you need to point to a statute that lets you do that, and you haven't. And you especially need to do that when some of the laws you're trying to preempt are the kinds of laws that 152B protects. This is not either of those things. This is a law that by definition goes well outside the intrastate space that 152B protects, and it's a law that squarely conflicts with a statutory decision the D.C. Circuit held the FCC was empowered to make. That's conflict preemption. That's ready. Could the state pass comparable regulation in the area of mobile broadband? No, there is an express preemption provision there in 332 that expressly preempts, and I think it's important... And then it carves out low-income rate regulation for mobile broadband, right? No, 332 does not do that, Donna. This law does not address mobile broadband precisely because... No, I know. It's a hypo. It's asking whether it could in mobile broadband. Let me just make sure I have the right provision. Yeah, 332, state preemption. It's an express carve-out for state preemption, right? Notwithstanding this title, no state or local government shall have authority to regulate the entry of rates charged by any... Yes, 332C3A, yes. Right, exactly. So that's saying... I mean, if your field preemption argument is right, I don't know why would you need that provision. I think the... Number two, the last sentence says, notwithstanding the first sentence of the subparagraph, a state may petition the commission for authority to regulate the rates of any commercial mobile service, and the commission shall grant such petition as the state demonstrates. And then it talks about market conditions. And I think both of those cut in our favor. So first, the provision at the end, right? The state can't just do it. It has to actually get the federal agency's approval to do it. And second, you know, it doesn't say notwithstanding the act. It does notwithstanding sections 152B and 221B. Local services... Why would you have the first sentence of the provision if your field preemption argument is right? Because of the notwithstanding. 152B is intrastate communications. Wireless communications include intrastate communications. But for this provision, states would have been free to regulate local and intrastate mobile wireless calls and the rates for them, just like they continue today to regulate the rates for local and intrastate landline calls. That notwithstanding says, we know we protected state authority over intrastate services, or in 221B, like in this, where we are right now, where a local calling area spans more than one state. We know we protected your authority to do that, states, but in the mobile space, we are taking it away. That's what that notwithstanding means. If all we had was field preemption, then in the mobile space, you would have replicated the landline phone space, where states regulate the rates for intrastate calls, and the FCC regulates the rates for intrastate calls. But that notwithstanding says, we in the mobile space are going to go beyond that. Not that we are going to... We're going to federalize it. States, if you want to get some of that back, you have to go ask the FCC for permission. Can I ask a slightly different question? Sure. You have... Am I right when I said to opposing counsel that you've shrunk the field of your field preemption argument? No, Your Honor. It was intrastate communication services. That's what the district court seems to have defined it as, and now you've reduced it to rate regulation of intrastate communications. No, Your Honor. So the district court concludes that the field is laws governing intrastate communications, and then identified this law as one such law. And we agree that this law falls within the field. The field certainly is not limited to this law, but I think it's important to note that the only people who are suggesting that Judge Hurley's decision preempts New York from, for example, you know, using its unfair competition law to pursue a provider broadband service  make false advertising, that's New York. We never argued for that. Judge Hurley never argued for that. But it doesn't follow from it. So why not? Because telling a provider what rate they have to charge is very different from a generally applicable law that says sellers of things to our customer or consumers can't lie about what their services are. They're very different types of rate regulation. Common carrier regulation, for example... You're just saying they're very different, but I'm not sure why that gets it out of the logic of your field preemption argument, because it's still a regulation on interstate communication services. I don't think it is, Your Honour, in the relevant sense. The Communications Act has always been about rates and terms and conditions. A law that says don't lie to your customers about the price of your service doesn't set the rates, terms and conditions of the service... at all. It simply says whatever those rates, terms and conditions are, you have to be truthful about them. Even the FCC, which tried to preempt as much as it possibly could, even non-conflicting laws, recognized that lying about your services is not something that constitutes regulation of the services themselves. I'm sorry, what stands for that principle? Even the FCC in the 2018 order recognized that states would be able... The FCC's regime is competition and consumer protection laws, unfair competition laws, mostly by the FCC, but also by the states, transparency and disclosures, and antitrust laws. And the view is that those all together would work to preserve the Internet openness and promote broadband. And even that FCC, which wanted to preempt, as Denise has found, well beyond what it could, because it wasn't limiting itself to conflict preemption, I think that's just a description of what they did, not an explanation for why it doesn't follow from the preemption argument, but we've been around the bend. I just want to circle back to Judge Nathan's question about what, if anything, could the FCC do to permit state regulation. So my question is, with all of the back and forth between Title I and Title II and all of this discussion, it sounds like your position is the act itself is so clear that no matter what the FCC decides, states cannot get into this field. Is that your position, that it doesn't matter that the FCC went back and forth, that this is just an area states can't go in one way or another? I think it's a matter of field preemption that states shouldn't be regulating the rates, terms, and conditions of interstate services. Well, but should is not my question. Is your position that the act precludes state regulation, including regulations along the lines of what's done by New York here, full stop, no matter what the FCC does? Yes, that is our position on field preemption. And I think it's telling that not only has no other state ever done this, but the cable experience, I think, cuts the other way. TVPICS, the court in TVPICS, thought that the service that Nevada was regulating or the Nevada locality was regulating was a local service. Well, that's not right under this court's New York telephone decision, as Judge Sullivan, you noted. Cable signals also don't stay within the state of Nevada. They were bringing signals from outside of Nevada in. But a court that thinks, well, it's perfectly fine for a state to engage in local rate regulation, that's not a holding that a law like New York's is permissible. And that's the only example in the history of communications regulation since Congress entered it in 1910 that the state can point to. 152A is how the 1930s Congress divided up fields. It did it in energy... So if Congress wanted to give room for state regulation of rate regulation of interstate communications, could they? Could it? Could Congress? Yes, Congress could. How would that look different than 152A? I think a modern Congress would have written 152A differently. But I think the 1930s Congress... What would it say? I think it would have made some reference to concurrent jurisdiction. Right, so you're saying what's required is an express statement by Congress of preemption, which is just the opposite of the law. I guess what I'm saying there, Nathan, is that if there had never been a Communications Act and Congress in 2022 or 2033 now were to write one and wanted field preemption, it would have written it a lot differently. And that had it not written it the way a modern Congress would write it, this court would be justified in not finding field preemption. But we have cases like Hughes and Schneiderwine where the Supreme Court is looking at 1938 statutes that mirror 152A and B and read them to be field preemptive. We have Louisiana Public Service Commission, which reads 152A to grant plenary authority to the FCC and talks about the states and the FCC remaining in their respective spheres. And it recognizes that even when a state or the FCC stays within its own sphere, because people use the same telephones for local and long-distance service, there may be spillover effects. And sometimes the spillovers may be so great that there's conflict preemption. But Louisiana Public Service Commission was a case about states trying to regulate intrastate rates and intrastate rates only. They weren't claiming that the depreciation schedules that they liked should be or had to be used for interstate rate setting. And so all the Supreme Court held there was that the two systems could coexist. And if New York were trying to regulate an intrastate broadband service, if you could define broadband that way, we would be having that debate about whether they could craft a regulation that applied to intrastate communications in a way that didn't spill over into the interstate space that conflicted with what the FCC did in the 2018 order or the fields that Congress reserved to the FCC. But that's not the case we have. New York decided that it wanted to regulate all of broadband, including the interstate communications parts of it. And that's when it conflicts with what the FCC chose in terms of how much of its statutory authority is recognized by the courts to exercise. So we don't have to do alternative holdings. And so I guess I'm asking, are you asking us to do a field preemption opinion or a conflict preemption opinion? Well, Your Honor, it's like asking me which of my twins I like the best. Well, there are differences between the two. So, I mean, I guess... I think the conflict preemption is narrower. I think the conflict preemption is the narrower ground. That's the one we put first. It's the one we put first below. It's the one we're putting first here. I think, Your Honor, it's fine that it's conflict preemption you can solve. This is just a structural question about your argument. They're not alternative arguments, right? You think your field preemption argument can coexist with your conflict preemption argument? I think that's right. I think that if the FCC had put broadband in Title II, states still wouldn't be allowed to regulate broadband rates regardless of the extent to which... Or at least the interstate rates. So we don't see them as alternative in that sense, no. But we also... You know, things can only be preempted once. And so, if it is conflict preempted, this Court doesn't need to reach the field question. And even if this Court found that the field is broad enough to allow some regulation when it doesn't conflict with what the FCC chose, exercising what the courts have recognized as its statutory authority, there could still be conflict preemption. That's for certain. That's why we think that conflict preemption is the narrow of the two, and that's why we led with it. Any other questions from my colleagues? No? All right. So take a seat, Mr. Armstrong. We'll now hear from Ms. Vail for two minutes. Thank you. Thank you, Your Honor. A couple quick things that I think are sort of misconstructions, and then I'll get to some bigger points. On TVPICS, TVPICS was very clear, expressed, that it was talking about an interstate service. And cable being an interstate service, not an intrastate service, goes back to the Supreme Court's cases in Southwestern Cable and Midwest Video. So I think that's clear. And that's a pretty big example of states doing this, because it wasn't just Nevada. If you look at the Internet for Professors amicus brief, there were 11 states that were regulating cable like that at the time, and New York was one of them doing twice regulation. I'll also just touch quickly on Louisiana and when it referred to plenary authority. It was, again, talking about common carriers, about telephone and telegraph. That was what that case was about. And the plaintiffs in the district court are getting Louisiana all backwards. Louisiana was saying that 152 has a limit on the FCC's authority. That's what 152B says. And that's what that case was about. But 152A does not have a limit on the state's authority. That's not in the statute. You can look at the difference between the two provisions and in the different way that the titles are set up. Going to, I think, a bigger picture point on conflict preemption, I do not think it's true that the FCC just could have gone further. The FCC can only go further in the sense that if it classifies broadband as Title II, then it would have quite a lot more authority, including preemptive authority. That does spring from forbearance. I mean, preemptive authority under Title II comes from multiple sources. Both the FCC's ability to do various things under Title II, and it's true that forbearance itself refers to the act, but the fact that they have statutory authority to forbear gives them the regulatory authority to then say, and now we're going to preempt states under Title II. That's what they did in 2015 when they forbear and said, warning states, we're going to use conflict preemption now because of our forbearance. And what the private plaintiffs are really trying to do here is to mix and match the titles. Mozilla got this just right. They're trying to hold on to the authority that it has under Title II and import it into Title I. So that's what Mozilla said, right? Mozilla talked about a broader preemptive authority, the preemption policy, basically, that the FCC was taking for itself. And Mozilla said, no, you don't get to do that. You've got to tether it to the statute. You can't go beyond that. But it expressly didn't say what you're saying here with respect to conflict preemption. I'm sorry. I agree on that. I'm not saying that Mozilla ruled on conflict preemption, but I also don't think that Mozilla was limited to the FCC's attempt to expressly preempt intrastate. Mozilla said that was like the double, the icing on the top that made the FCC's express preemption wrong. But it also said that as a threshold matter, the entire preemption order, including trying to preempt the states from regulating interstate services, lacked authority because the FCC did not have regulatory authority under Title I to do that. But that rejected the dissent's articulation of what is essentially your position, right? I agree. I don't think that, to be clear, I'm not saying that Mozilla ruled on conflict preemption. I agree with that. And Mozilla said that that argument of the dissent was a straw man in Mozilla because the conflict preemption issue was not raised. There was no actual state law. And so as appellate court do, it was saying, I'm not going to rule on that. So we agree that now the argument is before this court, just like it was before the court in the Ninth Circuit. And the Ninth Circuit just looked to Mozilla for its reasoning. I'm not saying that it was dispositive or that it ruled on conflict preemption. But its reasoning is correct. And one more thing I'm going to emphasize about the Mozilla dissent. The Mozilla dissent was worried about states coming in and doing laws that would have a forcing effect across the nation, where the states doing a law might essentially create a federal regime where all the other states would have to follow it. That's what it was saying about the one state that puts in a law. But that's where the local character of New York's law matters. We're not saying that it's interstate for 152B. But what it is, it's a pricing provision that applies only to New York consumers, only to broadband companies offering services in New York. It doesn't have any nationwide effect on other states or on broadband providers in other states. Broadband providers already provide, offer different prices in different states all the time. They offer different prices in different parts of New York. So it doesn't have that kind of potentially nationwide spillover, which is what the Mozilla dissent was worried about. And that's what the FCC was also primarily worried about for itself, for federal power, when it said one of the reasons why we're moving to Title I is because we don't want the future FCC to change its mind on forbearance. If the future FCC changed its mind on forbearance, then the full weight of Title II would come down nationwide by 50 states. That was the main fear. And as my colleague said, the FCC even acknowledged that states would continue to have consumer protection authority. And that was one of the reasons why the FCC said it wasn't going to stay in Title II. It didn't need it. Thank you, Jeff. Thank you very much.  We got our money's worth from you folks today. Thank you, Jeff. Our next case is the United States versus Collins and Ramirez. This is one where we have to make sure our technology is set so that we can get it to ensure that. Mr. Breslin, are you on the line? And Ms. Beard, can we get that on our screens? He's not on the screen. Oh, he's not on the screen at all. Oh, I thought that the screen and the voice might be out of sync. I think that what he did is he has both on. Mr. Breslin, let me just hear you. I want to do an audio check. Yeah, we're getting a lot of reverb on you. Let's just do phone, I think. We're not getting video, but your video is creating the reverb with the audio. We probably ought to just go audio. How is this, Your Honor? That's better. Talk a little more. Thank you for accommodating my health issues, Your Honor. I do really appreciate it. I'm sorry for this. No, that's okay. It's not a problem at all. We've gotten good at it, so I'm disappointed we can't see you, but we'll listen attentively and we won't be distracted by what you're wearing or what's going on behind you. Mr. Breslin, let me just set the ground rules here. The way we set this up is 12 minutes for each side, and you and counsel for Mr. Ramirez have split this six and six, but you've each reserved a minute for rebuttal. Is that right? That's correct. Okay. We can do that. All right. So, Mr. Breslin, that gives you five minutes now out of the gate. I don't know if you have a clock that you can see, but hopefully you have a timer nearby. I'll let you know when the time's up, okay? Thank you, Judge. If it pleases the Court, Your Honor, we raised in our briefing three issues regarding Mr. Collins and Mr. Collins' conviction. The first is the supposedly voluntary consent of his home resulting in the weapons that were seized there, which constituted count three of the indictment. And then there is a group issue regarding the statement made by Mr. Ramirez, which was redacted, recontended properly, but read to the jury. And then there is an insufficient evidence at trial point. I will concentrate the time I have on points one and two. The totality of the circumstances, which is, I think, the legal metric by which the warrantless search of Mr. Collins' home has to be evaluated, shows that he did not give voluntary consent for the search of his home. And I think... We'll go back into his apartment, right? His home. That is what one agent said. Mr. Collins did not... The District Court credited that... The District Court credited that testimony, correct? Correct. Go ahead, I'm sorry. Well, just, I mean, on what basis would we conclude that that was error? Well, the District Court, in our view, did not focus on what we think the most salient point of the so-called consent was, which is that the government agent had a motive to kind of concoct a scenario by which he needed to get into the house. Agent Menden, at the suppression hearing, testified that he was aware that there were likely guns in the Collins' home. He had received that information at some point from a cooperating witness, but he also conceded that that evidence was stale and that he did not think he was going to be able to get a search warrant based upon quality of that evidence. So the only way that the government could gain access to Mr. Collins' home was to make an argument that he somehow consented. And if you look at the circumstances by which Mr. Collins was stopped, it just simply doesn't make sense. But, again, this was argued to, and certainly could have been amplified in front of the District Court, right? It was argued to the District Court, Your Honor. That is correct. But the District Court, in our view, did not adequately weigh and consider the totality of all the circumstances. I mean, Your Honor, this was a gentleman who left his house at 6 o'clock in the morning, was dressed for work, was arrested on the street while he was throwing his garbage away, surrounded by a phalanx of government agents with long guns, forced to lie down face-down on the street with guns drawn, dressed to handcuff... No, I think we get all that. I think the issue is, do those facts compel a conclusion that people confronted with those sorts of things don't ask for codes? Well, the issue of the code, we feel, was really a pretext. This arrest took place in June. The record showed that Mr. Collins was wearing multiple layers of clothing as he was getting ready to go to work. This is something that was put before the court. It was 60 degrees that morning. Now, the government made a big issue that this was somehow unseasonably cold for June and that ancient men took the position that Mr. Collins was shivering and Mr. Collins struck him as the kind of person that when he got cold was going to stay cold all day. I mean, Your Honors, with all due respect, those are after-the-fact justifications in order for them to make the argument that he had asked for a code. He was dressed for work. There was just no rational way that he would have asked, that he would have invited, you know, dozens of armed law enforcement officers into his home where he knew there were guns because he was a little bit chilly in the middle of June. It doesn't make sense. Mr. Breslin, your red light is on, but you probably can't see it. So why don't we get to the Bruton issue very briefly. Very briefly, Your Honor. In fact, you're right. I am having a little trouble with not only my voice but with the time. Mr. Breslin, I'll just ask out of the gate if you think we should hold decision on this sending the Supreme Court's resolution of the Samia case, which they just took, on arguably comparable Bruton issues. Quite possibly, Your Honor. That was fairly recent and obviously posted in any of our briefings. Right. But I know in a very general sense what that case is about, and there is a fair amount of overlap. I mean, it's from the circuit, although it was a summary order, but it applies our circuit law on the redaction issue. The redaction issue is a tricky one, Your Honor. I mean, in our view, the redactions that were applied here by the district court simply didn't make it not obvious, which is a double-edged sword, but it didn't make it not obvious that the person Mr. Ramirez was talking about was in fact Mr. Collins. Why is that? There were multiple co-conspirators, right? There were not multiple co-conspirators. Well, I mean, there were multiple co-conspirators in the sense of Mr. Moab and Mr. Johnson. Correct. But those names, you know, the way the questioning was done and the way the statement was structured, in our view, makes it clear that the person, whether he was known as the guy or him, could not have been anybody other than Mr. Collins. And as a result, we feel that the statement was profoundly prejudicial in what we contend, from a purely evidentiary point of view, was a close case. All right. Well, you're over, but you've reserved a minute for rebuttal, so why don't we hear now from your colleague, Ms. Van Ness, for Mr. Ramirez. Good morning. I, too, have raised three issues in the brief, and I'm going to concentrate on point one. The hallmarks of a criminal investigation of any kind are motive and opportunity, and on both these points, I think the evidence strongly demonstrates that there was a plot to assault Mr. Santiago, but it's inconsistent with a plot to kill Mr. Santiago. But there's an eyewitness who said the exact opposite, and so you're saying that the evidence in this case was so overwhelmingly of a nature that the jury would have been compelled to disregard the testimony of Moab? I think if the jury's attention had been focused on all the arguments that are presented on appeal, which they weren't, that they would have reached a different result. And so I understand the deficiency argument.